IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| **LAMEEK JOHNS,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 7:19-cv-00409** |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **J.S. LOVELL, *et al.*,**[1] | ) | **By: Norman K. Moon** |
| **Defendants.** | ) | **Senior United States District Judge** |

Plaintiff Lameek Johns, a Virginia inmate proceeding *pro se*, filed this civil rights action

pursuant to 42 U.S.C. § 1983 naming numerous defendants.  He brings, *inter alia*, excessive

force and bystander liability claims against the remaining defendants, arising from an incident

that allegedly occurred on April 13, 2019, at Red Onion State Prison ("Red Onion"), where

Johns was housed.[2]

Pending before me is defendants' motion for summary judgment (Dkt. No. 38), in which

they seek summary judgment as to Johns's amended complaint solely on the grounds that Johns

failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act

("PLRA"), 42 U.S.C. § 1997e(a).  As discussed in more detail below, I conclude that there are

disputes of fact as to whether Johns failed to exhaust his available remedies and so defendants'

motion for summary judgment must be denied.  I will refer the matter to the magistrate judge for

further proceedings on exhaustion.

I also will deny without prejudice Johns's motion for summary judgment (Dkt. No. 49),

and I will deny Johns's motion for sanctions (Dkt. No. 53) and Johns's motion to strike Jennifer

---

[1]  Defendants point out that several of their names are misspelled.  The Clerk will be directed to update the spelling of defendant "Clevinjer" to "Clevinger," defendant "Sergeant" to "Sargent," and defendant "Ambergie" to "Amburgey."

[2]  I previously granted defendant Ball's motion for summary judgment, and she has been terminated as a defendant.

Messer's affidavits (Dkt. No. 57).[3]

## I.    BACKGROUND

### A.    The April 13, 2019 Incident

Johns's claims against the remaining defendants all stem from events that occurred on

April 13, 2019, at Red Onion.  (*See generally* Am. Compl., Dkt. No. 7; *see also* Defs.' Mem.

Supp. Mot. Summ. J. at 2–3, Dkt. No. 39 (setting forth Johns's allegations in numbered claims).)

According to the amended complaint, the incident at issue began as a verbal altercation between

Johns—while he was in his cell—and defendant Mullins.  After defendant Gilbert was called to

the pod, he advised that they were going to search Johns's cell.  Johns contends that he was

complying, although slowly, with instructions to place his personal property in laundry bags so

the cell could be searched.  Nonetheless, defendant Gilbert construed Johns's slow movements as

a refusal to come out and allow his cell to be searched.  Thus, Gilbert determined Johns should

be extracted from his cell.  (Am. Compl. 7–10.)

The extraction team (consisting of five other defendants) then administered a burst of OC

spray[4] through a bottom side vent of Johns's cell, which rendered him unable to resist.  He was

subsequently extracted.  During the extraction, Johns claims that the extraction team used

excessive force both by knocking him on the ground with an "electric shield" and by then falling

on top of him.  Thereafter, although he put his hands behind his back and was not resisting,

Johns says he was subjected to a savage beating by some of the defendants.  The beating

included being hit repeatedly and viciously on and about his head and face, both with hands and

---

[3] The defendant named Messer is a correctional officer; Jennifer Messer is the grievance coordinator at Red Onion and is not a party in this lawsuit.

[4] OC spray is a chemical agent similar to what is commonly known as pepper spray or mace, and it can irritate a person's eyes, throat, and nose.  *See, e.g.*, *Park v. Shiflett*, 250 F.3d 843, 849 (4th Cir. 2001).

steel handcuffs, and also involved an attempt by defendant Lovell to pull Johns's eye out of its socket.  (*Id.* at 10–12.)

Johns claims that he lost consciousness during the beating.  He also alleges that the beating resulted in significant injuries, some of which continued through the filing of his complaint.  These included his needing internal and external sutures, bruised, swollen, and black eyes, cut lips, bruises on various parts of his body, and "acute chronic pain" in his right rib, lower back, and both ankles.  He also suffers from mental and emotional anguish.  (*Id.* at 12–13.)

His amended complaint further alleges that, after his extraction, some of the defendants failed to provide him with medical treatment, including failing to allow him to decontaminate from the OC spray.  Instead, they placed him in ambulatory restraints in a solitary cell.  He alleges that the chain on his restraints was made so short that he was left in a hunched position for the 15½ hours he was in the cell, and that the handcuffs cut into his wrists causing pain and discomfort.  He was unable to use water to wash off the OC spray or to drink, and he was forced to urinate and defecate on himself and left to shiver in the cold.  He alleges that the defendants who were making security checks failed to remedy the problem with his restraints, refused to allow him to shower or clean himself off, and did not treat his injuries or otherwise help him. (*Id.* at 14–20.)

**B.     Plaintiff's Claims**

Defendants construe the amended complaint as setting forth the following claims,[5] and Johns does not dispute that characterization in his response to the summary judgment motion:

> **Claim 1:**  Defendants Mannon, Lovell, Hubbard, Clevinger, and Messer violated plaintiff's Eighth Amendment rights by using excessive force which constituted cruel and unusual punishment. Compl. ¶ 135.

---

[5] Claim 7 is omitted from the list because it pertains only to defendant Ball, who has been dismissed. I retain the original numbering to avoid confusion.

3

**Claim 2:**   Defendants Gilbert, Eldridge, Bray and Mullins violated plaintiff's Eighth Amendment rights by engaging in deliberate indifference by failing to intervene in the use of excessive force by Defendants Lovell, Mannon, Hubbard, Clevinger, and Messer. Compl. ¶ 136.

**Claim 3:**   Defendants Gilbert, Eldridge, Mannon, Messer, Clevinger, Lovell, Mullins, and Hubbard violated plaintiff's Eighth Amendment rights by misapplying the ambulatory restraints in a malicious and sadistic manner that caused him substantial harm and amounted to cruel and unusual punishment. Compl. ¶ 137.

**Claim 4:**   Defendants Eldridge, Bray, Deel, Heckford, Philips, Cole, Sargent, and Amburgey violated plaintiff's Eighth Amendment rights by refusing to fix the ambulatory restraints that had been misapplied and were deliberately indifferent to the substantial risk of harm to the plaintiff which constituted cruel and unusual punishment. Compl. ¶ 138.

**Claim 5:**   Defendants Gilbert, Eldridge, and Amburgey violated plaintiff's Fourteenth Amendment right to due process by not providing plaintiff with notice or a hearing before or during the time that plaintiff was in ambulatory restraints to determine whether he should have been released. Compl. ¶ 139.

**Claim 6:**   Defendants Gilbert and Mullins violated plaintiff's Eighth Amendment rights by failing to intervene to prevent the misapplication of the ambulatory restraints thereby being deliberately indifferent to plaintiff's needs which constituted cruel and unusual punishment. Compl. ¶ 140.

**Claim 8:**   Defendants Mullins and Messer violated plaintiff's First Amendment by breaking his earbuds because he filed a grievance and lawsuit against them. Compl. ¶ 142.

**Claim 9:**   Defendants Mullins and Messer violated plaintiff's First Amendment rights by denying plaintiff access to the courts by taking plaintiff's legal pleadings, grievances, certificates of services, affidavits, and informal complaints from plaintiff's property. Compl. ¶ 143.

**Claim 10:** Defendants Mannon, Lovell, Hubbard, Clevinger, and Messer maliciously and sadistically committed the state-law tort of assault and battery in violation of Code § 18.2-57 to cause harm to plaintiff. Compl. ¶ 144.

These claims can be roughly grouped as being based on four events.  First, Claims 1, 2,

and 10 relate to excessive force used during the cell extraction and immediately afterward.

Second, claims 3, 4, 5, and 6 all relate to Johns's placement in ambulatory restraints and

treatment while in them.  Third, Claim 8 is based on the destruction of his earbuds by defendants

4

Mullins and Messer, which Johns learned about on April 17, 2019.  Fourth, Claim 9 is based on

the destruction of plaintiff's documents, which Johns also discovered on April 17, 2019.

**C.       Grievance Procedure at the Virginia Department of Corrections ("VDOC")**

VDOC Operating Procedure ("OP") 866.1, Offender Grievance Procedure, is the

mechanism used to resolve inmate complaints, and it applies to most aspects of prison life.  OP

866.1 requires that, before submitting a formal grievance (also known as a "regular grievance"),

the inmate must demonstrate that he has made a good faith effort to resolve the issue informally

through the procedures available at the institution to secure institutional services or resolve

complaints.  Generally, this may be accomplished by submitting an informal complaint to the

grievance department, which is then forwarded to the appropriate staff for investigation and

response.  The response should be given within 15 calendar days.  (J. Messer Aff. ¶ 7 & Ex. A,

Dkt. No. 39-1.)

If the informal resolution effort fails, the inmate must initiate a regular grievance by

filling out the appropriate form.  Regular grievances generally must be submitted within 30 days

from the date of the incident or discovery of the incident.  Even if an offender has not received a

response to an informal complaint, the offender still must submit the regular grievance within 30

days of the date of the incident or its discovery and can submit the informal complaint *receipt* as

documentation, rather than the informal complaint itself, as is normally required.  (*Id.*; Messer

Ex. A, OP 866.1 § V(A)(3).)

Prior to reviewing the substantive claims of the grievance, prison officials conduct an

"intake" review to ensure that it meets the published criteria for acceptance.  In addition to

including the informal complaint or receipt, the grievance must raise a grievable issue and may

contain only one issue.  (Messer Aff. ¶ 7; OP 866.1 §§ IV(M), VI(A)(2).  If the grievance does

not meet the criteria for acceptance, prison officials complete the "intake" section of the

5

grievance and return it to the inmate with instructions on how to remedy any problems with it.

That should be done within two days of receipt.  The inmate may seek review of the intake

decision by sending the grievance form to the regional ombudsman.  There is no further review

of the intake decision.  (Messer Aff. ¶ 5.)

Notably, OP 866.1 explains that "[i]f a Regular Grievance does not meet the criteria for

acceptance and review by the Regional Ombudsman does not result in intake into the grievance

process, the issue must be resubmitted in accordance with the criteria for acceptance.  *The*

*exhaustion of remedies requirement will be met only when the Regular Grievance has been*

*accepted into the grievance process and appealed through the highest eligible level without*

*satisfactory resolution of the issue.*"  (Messer Ex. A, OP 866.1 § IV(O)(2)(b) (emphasis added).)

Thus, if a prisoner never submits a regular grievance, or his regular grievance is never properly

submitted and rejected at intake, he has not properly exhausted.

There are three levels of review for an accepted regular grievance.  The Facility Unit

Head of the facility in which the inmate is confined is responsible for Level I review, and a

response must be issued within 30 days.  A dissatisfied inmate may appeal to Level II, which is

conducted by the Regional Administrator, the Health Services Director, or the Chief of

Operations for Classification and Records.  Level II responses must be made within 20 days.  For

most issues, Level II is the final level of review.  The Level II response informs the offender

whether he may pursue an appeal to Level III, which is the final level of review.  For those issues

appealable to Level III, the Chief of Corrections Operations or Director of VDOC conducts a

review of the grievance, and the response must be made within 20 days.  (Messer Aff. ¶ 9.)

Defendants have presented evidence that Johns failed to exhaust all of his claims.

(Messer Supp. Aff. ¶ 10, Dkt. No. 55-1.)  For his part, Johns appears to concede that he did not

have a grievance accepted at intake raising any of these claims and he does not reference having

appealed at least through Level II as to any of these issues.  He contends, though, that he made

good faith attempts to exhaust administrative remedies, but he was precluded from doing so by

defendants' actions.  Facts concerning Johns's attempts at exhaustion are discussed in context

below.

## II.   MOTIONS FOR SUMMARY JUDGMENT

### A.  Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A

genuine issue of material fact exists only where the record, taken as a whole, could lead a

reasonable jury to return a verdict in favor of the nonmoving party.  *Ricci v. DeStefano*, 557 U.S.

557, 586 (2009).[6]  In making that determination, the court must take "the evidence and all

reasonable inferences drawn therefrom in the light most favorable to the nonmoving party."

*Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials

of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for

trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Moreover, "[t]he mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment."  *Id.* at 247–48.  Instead, the non-moving

party must produce "significantly probative" evidence from which a reasonable jury could return

a verdict in his favor.  *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990).

---

[6] Internal citations, alterations, and quotation marks are omitted throughout this opinion, unless otherwise noted.  *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

**B.   Defendants' Motion for Summary Judgment**

   **1.   Exhaustion under the PLRA**

   As noted, defendants ask for summary judgment on the grounds that Johns failed to

exhaust his administrative remedies.  The PLRA provides that "[n]o action shall be brought with

respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner

confined in any jail, prison, or other correctional facility until such administrative remedies as

are available are exhausted."  42 U.S.C. § 1997e(a).  The exhaustion requirement "allow[s] a

prison to address complaints about the program it administers before being subjected to suit,

reduc[es] litigation to the extent complaints are satisfactorily resolved, and improve[es] litigation

that does occur by leading to the preparation of a useful record."  *Jones v. Bock*, 549 U.S. 199,

219 (2007).  "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be

brought in court."  *Id.* at 211.

   The PLRA requires "proper exhaustion" of available remedies prior to filing suit.

*Woodford v. Ngo*, 548 U.S. 81, 90 (2006).  "[P]roper exhaustion demands compliance with an

agency's deadlines and other critical procedural rules because no adjudicative system can

function effectively without imposing some orderly structure on the course of its proceeding."

*Id.* at 90–91.  Thus, an inmate's failure to follow the required procedures of the prison's

administrative remedy process, including time limits, or to exhaust all levels of administrative

review is not "proper exhaustion" and will bar the claim.  *Id.* at 90.  Notably, moreover, district

courts may not "excuse a failure to exhaust."  *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016).

   A prison official has the burden to prove an inmate's failure to exhaust available

administrative remedies.  *Jones*, 549 U.S. at 216.  Once a defendant presents evidence of a

failure to exhaust, the burden of proof shifts to the inmate to show, by a preponderance of the

evidence, that exhaustion occurred or administrative remedies were unavailable through no fault

of the inmate. *See, e.g., Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011); *Graham v. Gentry*, 413 F. App'x 660, 663 (4th Cir. 2011) (unpublished).

"[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). "[W]hen prison officials prevent inmates from using the administrative process . . . the process that exists on paper becomes unavailable in reality." *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). The Supreme Court has explained that an administrative remedy is considered unavailable when: (1) "it operates as a simple dead end— with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1859–60. Federal courts are "obligated to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials." *Hill v. O'Brien*, 387 F. App'x 396, 400 (4th Cir. 2010).

### 2. Johns's Attempts at Exhaustion

As described in the factual section above, to fully exhaust his grievances under OP 866.1, Johns was required to follow all the steps of that procedure, beginning with the informal complaint process, continuing with a regular grievance accepted at intake and addressed at Level I, and then completing at least a Level II appeal (or a Level III appeal, if available). In essence, it is undisputed that Johns did not fully and properly exhaust any of his claims. He does not contend, for example, that any of his grievances were accepted or that he appealed through Level II or III the denial of any grievance. But he alleges that he attempted to exhaust and was thwarted by defendants' repeated refusals to process his complaints and grievances.

Johns also relies on the fact that, during most of the thirty days that he had to file his

9

grievances, he was on a grievance restriction.[7]  Specifically, on April 22, 2019, Red Onion's

warden gave Johns a memorandum advising that, for a period of 90 days, Johns would only be

permitted to file one informal complaint and one grievance per week.  (Dkt. No. 84-4 at 28.)

That notification also informed Johns that any excess filings would be returned to him, and

further notified him that he could grieve the restriction decision through the regular grievance

procedure without an informal attempt.  (*Id.*)

Effectively, Johns argues the grievance procedure was unavailable to him.  If he is

correct, then his claims may go forward; he only is required to exhaust all "available" remedies.

*Moore*, 517 F.3d at 725.

Johns has offered his own sworn testimony, some of it confirmed by documents,[8]

regarding his attempts at exhaustion.  First, it appears undisputed that he submitted at least three

informal complaints, and he says he submitted four, fairly referencing all of the claims in this

lawsuit.  Specifically, Johns has submitted copies of three informal complaint forms dated April

21, 2019, before he was placed on grievance restriction.  They all have a date-stamp indicating

that they were received on April 24, 2019 by the grievance department, after the grievance

restriction was in place.  (Dkt. No. 48-4 at 1, 8, 16; *see also* Dkt. No. 52-1, Exhibits A, B & C to

---

[7]  OP 866.1 allows for grievance restrictions to be placed on inmates who abuse the grievance procedure through "excessive filings or habitual misuse."  OP 866.1 § IV(K).  The policy provides that a face-to-face interview should be conducted prior to initially placing an offender on a limitation status, *id.* § IV(K)(3)(b), but no party addresses whether that face-to-face meeting occurred with Johns or, if so, when.

[8]  Review of this case and the relevant documents was complicated by the fact that Johns frequently refers to exhibits without indicating a particular docket number of where they can be located.  In his amended complaint, for example, when discussing his exhaustion of remedies, he refers to exhibits A through D, but no exhibits were attached to his original complaint or amended complaint.  Although documents labeled "Exhibits A through C" were located, they were attached to Johns's much later-filed motion for sanctions.  He has submitted what appear to be many of the referenced exhibits in opposition to summary judgment, although they contain different labels—using numbers instead of letters.  Even those, though, appear to be missing exhibits.  That is, those exhibits start at Exhibit 1 and end at Exhibit 31, but do not contain Exhibits numbered 19, 20, 22, 23, 25, or 26.  (*See generally* Dkt. No. 84-4.)  Some of the lettered exhibits referenced by Johns simply could not be located.

Pl.'s Mot. for Sanctions.)  They relate to his excessive force claims, ambulatory restraint claims, and claim that his documents were taken.  (*Id.*)  The allegation concerning his lost or damaged earbuds is not referenced in those three informal complaints, but Johns has provided other documents that purportedly set forth the language that was in his informal complaint and grievance concerning the earbuds, (Dkt. No. 48-4 at 20, 22), and he specifically avers that he submitted all four.  (Pl. Decl. ¶ 7, Dkt. No. 48-1.)

Johns states that his informal complaints were not processed, and Messer admits as much in her supplemental affidavit.  (Messer Supp. Aff. ¶¶ 5–6, Dkt. No. 55-1.)  They were received after he was placed on grievance restriction, and so they were not logged or responded to.  (*Id.*; *see also* Messer Aff. ¶ 8 ("[A] grievance is stamped and considered received on the date it is received into the grievance department.").)

Based on the current record, though, it is impossible to determine whether all four complaints were *properly* rejected.  In particular, it is not clear when each "week" described in the warden's notification began, nor does the evidence disclose whether another informal grievance had already been processed for the first "week."  If not, then one of the four arguably should have been accepted for processing.

Upon receiving them back, Johns says he tried to "appeal," by mailing them to the regional ombudsman, asking that they be processed.  (Pl. Decl. ¶ 8; *see also* Pl. Opp'n 1–2, Dkt. No. 48.)  That was not the proper procedure for him to follow, pursuant to OP 866.1, and they were not processed.  The regional ombudsman addresses appeals challenging intake decisions from *grievances*, not informal complaints.  Instead, to *properly* exhaust, Johns should have waited until the following week to re-submit one of the informal complaints so that it would be processed despite the grievance restriction.  (Messer Supp. Aff. ¶ 7.)  Then, he could have filed a grievance on that issue.

Johns also avers that on April 28, 2019, he filed four "regular grievance forms" addressing "the same issues" that he had raised in the four informal complaint forms.  (Pl. Decl. ¶ 9.)  He asserts that they were forwarded back to him from the Red Onion grievance department without being processed, and "the back side of the regular grievances" indicated that they were rejected because Johns "had not used the informal process to resolve [his] complaint."  (Dkt. No. 48 at 2.)  According to Johns, he then mailed the four unprocessed regular grievances to the regional administrator with letters requesting that they be processed, but they were not.  (Pl. Decl. ¶¶ 11, 12.)

Although Johns avers that he filed the grievances, he has not provided any copies of those grievances, date-stamped or otherwise.[9]  Nor has he provided any other contemporaneous evidence showing that he actually submitted any grievances on any of these issues.  Instead, he has provided entirely hand-written documents titled "Certificate of Service," which are dated in April or May 2019, and which purport to be "proof" that he sent the grievances referenced in the "Certificates" either to the institutional ombudsman and/or to the regional ombudsman.  (*See, e.g.*, Dkt. No. 48-4 at 5, 12, 22.)

None of the "certificates" that relate to the grievances are marked as received or otherwise show that they were sent.  In that respect, they are different from others Johns has submitted that have a "received by" stamp from the grievance department and/or the regional ombudsman.  Nonetheless, Johns avers that he filed them, and his certificates contain the

---

[9]  Johns offers no explanation as to why he does not have copies of those grievances; he simply says that he sent the grievances to the regional administrator after receiving them back and being told they would not be processed.  He does not state whether he received them back or not.  In his amended complaint, he alleges that defendants Messer and Mullins removed grievances and other documents from his personal property that was seized on April 13, 2019.  He states, however, that he discovered this on April 17 and complained about it in an informal complaint on April 21.  (Am. Compl. ¶ 27.)  He does not allege that anyone took copies of his documents *after* those dates, and the grievances he said he filed were dated April 28, 2019.  Thus, he cannot point to the earlier seizure of his papers as a reason for why he does not have copies of the grievances.

purported text of three of those grievances, which encompass the excessive force claims (Dkt.

No. 48-4 at 5), the ambulatory restraint claims (*id.* at 12), and the claim concerning the loss or

damage of his earbuds, (*id.* at 22).  He has submitted documents concerning the informal

complaint about the loss or destruction of his other property (court and grievance documents,

etc.), but not a grievance.[10]  Messer appears to dispute that Johns filed the grievances, noting that

there is no record of their receipt.  She also acknowledges, though, that informal complaints and

grievances filed in excess of a grievance restriction are not logged or tracked; they are merely

stamped received and given back to the offender.  (Messer Supp. Aff. ¶ 5.)  Thus, she cannot say

with certainty whether he in fact sent those grievances or not.[11]

Defendants insist that Johns had remedies available to him.  They emphasize that Johns

has eight days between when the incident occurred on April 13, 2019, and the April 22, 2019

imposition of the grievance restriction, and he could have filed informal complaints on all of

these incidents during that period and then later filed grievances.[12]  And they note that during

that period, Johns filed five informal complaints and two regular grievances, none of which

related to the claims against these defendants, although Messer does not specify what issues they

raised.  (*See* Messer Aff. ¶ 13.)  Defendants also note that Johns could have submitted one

grievance per week once placed on grievance restrictions, but he did not.  (*Id.* ¶ 14.)

The fact that Johns had eight days to file and then could have filed one grievance and one

---

[10]  All of Johns's claims may not stand on the same footing, but that will be an issue to be determined at the proceedings on the exhaustion issue.

[11]  In Messer's initial affidavit, she averred that, based on Johns's grievance records, he did not submit any informal complaints or grievances concerning the issues in his lawsuit.  Then, when Johns pointed out that the informal complaints had been marked as received, she revised her testimony slightly in a supplemental affidavit. (Dkt. No. 55-1.)  She still insists, though, that he did not exhaust any of the claims.  (Messer Supp. Aff. ¶ 10.)

[12]  Of course, Johns *did* submit his informal complaints before the grievance restriction (on Sunday, April 21, 2019); they just were not received (and deemed filed) until April 24, 2020.

informal complaint per week thereafter does not necessarily render the grievance process

"available" to him, however.  First of all, the restrictions would have made the timing difficult.

Specifically, even if he had filed the informal complaints related to the excessive force and

ambulatory restraints on the next day, April 14, 2019, he still would have had to file those

grievances within 30 days—by May 13.  Similarly, he did not discover his property claims until

April 17 and if he had filed his informal complaints as to those issues the next day, he still would

have had to file his grievances by May 17, 2019.  Once the grievance restriction was in place,

however, he would have been limited to one grievance per week.[13]  So, even if all of the

informal complaints had been returned to him before April 22—an unlikely occurrence because

staff has 15 days to respond—the first grievance could have been filed April 22, so long as Johns

was not already barred for that week.  The second grievance could have been filed April 29, the

third on May 6, and the fourth on May 13.  By the following week (May 20), his 30-day time

limit for all claims would have expired.  So, there is a theoretical possibility that he might have

been able to time everything perfectly and, had none of his grievances rejected for any reason, he

might have exhausted.  But of course, before being notified of it, he had no reason to know that

he would be placed on grievance restriction, such that time was of the essence in filing his

informal complaints.  Additionally, as noted, he apparently submitted his four informal

complaints on April 21, before the restriction was imposed, although they were received

afterward.

Defendants do not raise the possibility, but Johns also could have grieved the grievance

restriction itself.  Indeed, the April 22, 2019 notification of the restriction specifically informed

Johns that he could "grieve [the] decision through the regular grievance procedure without an

---

[13] As noted, neither the memorandum imposing the restriction nor any evidence in the case has explained
when the first "week" began.

informal attempt." (Dkt. No. 48-4 at 28.) He does not allege that he filed a grievance directly

challenging that decision, although his letters to the regional ombudsman did reference the

restriction and ask that it be lifted. But if he had filed such a grievance and it had been

unsuccessful, he would have "wasted" one of his weekly grievances.

If Johns could have brought all of these claims in a single informal complaint and

grievance, then it is likely that remedies remained available to him. That is, if he had already

used his grievances for the week of April 22, 2019, he could have waited one week and then

submitted an informal complaint, waited for its return, and then submitted a formal grievance,

likely within the 30-day window. But based on OP 866.1, a grievance may only contain one

issue (Messer Aff. ¶ 8 ("Only one issue may be addressed per grievance"), so a grievance will be

rejected at intake if it grieves more than one issue. It appears, then, that Johns was required to

file separate informal complaints for each of his "issues" and then pursue the grievances

separately. Doing so (and being limited by his grievance restriction to one informal complaint

and one grievance per month), it is questionable whether he could have timely grieved *all* of

these events.

I am not suggesting that a failure to process a grievance would render administrative

remedies unavailable, nor does a grievance restriction alone make the remedy unavailable. *See,*

*e.g., Moore v. Bennette*, 517 F.3d 717, 721, 730 (4th Cir. 2008) (affirming district court's

decision that plaintiff had failed to exhaust his administrative remedies where plaintiff could

only have one active grievance at a time and plaintiff had "no excuse for not resubmitting" a

grievance after the completion of another grievance); *see also Bryan v. S.C. Dep't of Corr.*, No.

4:08-cv-1590-TLW-TER, 2009 WL 702864, at *3 (D.S.C. Mar. 16, 2009) ("The fact that

a grievance was unprocessed, without more, is insufficient to show that [prison officials]

prevented [a prisoner] from exhausting his administrative remedies."). But in this case, based on

15

Johns's testimony, there is more.  Here, the grievance restriction, the rejection of his informal complaints and grievances—especially when it is unclear whether they all should have been rejected or one should have been permitted as his one informal complaint for the week—and the requirement that each grievance contain only a single issue, all combined and may have made the administrative remedy unavailable to Johns as to his claims in this case.

Moreover, unlike other cases in which a plaintiff has simply made general assertions that he was prevented or discouraged from filing grievances, Johns has provided dates of the documents, dates that they were returned, and dates that he sent them to the regional ombudsman.  He also has filed what purports to be the text of those grievances.  *Compare, e.g.*, *Pickens v. Lewis*, No. 1:15-CV-275-FDW, 2017 WL 3277121, at *4 (W.D.N.C. Aug. 1, 2017) (collecting authority from within the Fourth Circuit and elsewhere holding that "unsubstantiated and conclusory assertions by prisoner-plaintiffs that prison grievances were hindered, without providing any details regarding the date the alleged grievances were submitted or to whom they were submitted, fail to create a genuine issue of material fact sufficient to withstand summary judgment").

For all of these reasons, I conclude that there are disputes of facts as to whether remedies were "available" to Johns.  Accordingly, I will deny defendants' motion for summary judgment and refer the issue to the magistrate judge for further proceedings on the exhaustion issue.[14]

## C.   Plaintiff's Motion for Summary Judgment

Johns also has filed for summary judgment, although not in compliance with all of the

---

[14]  "The circuit courts of appeals have uniformly found that a judge can resolve factual disputes concerning exhaustion of administrative remedies under the PLRA." *Hill v. Haynes*, No. 3:06-CV-136, 2014 WL 4197588, at *3 (N.D.W. Va. Aug. 22, 2014), *aff'd,* 591 F. App'x 223 (4th Cir. 2015) (unpublished).  Such questions of law arising in prisoner civil rights actions may be referred to a magistrate judge for factual development and preparation of a report making proposed findings of fact, conclusions of law, and recommended disposition of the issue. 28 U.S.C. § 636(b)(1)(B), (C).

requirements of Rule 56, and defendants have failed to respond.  In any event, he explains that he

seeks summary judgment on the issue of "liability," which will be determined *after* resolution of

the issue of whether he has exhausted his administrative remedies.  Accordingly, plaintiff's

motion for summary judgment is DENIED WITHOUT PREJUDICE.  In the event that

exhaustion is resolved in Johns's favor, he may refile his summary judgment motion at that time.

### III.  OTHER MOTIONS

Also pending before the court are two motions filed by Johns and related to Messer's

testimony.  First, in his motion for sanctions, Johns alleges that Messer, a non-party, submitted

false testimony in her first affidavit with the intent to defraud the court.  He specifically asks for

sanctions under Rule 56(h), which states:

> If satisfied that an affidavit or declaration under this rule is
> submitted in bad faith or solely for delay, the court—after notice
> and a reasonable time to respond—may order the submitting party
> to pay the other party the reasonable expenses, including attorney's
> fees, it incurred as a result. An offending party or attorney may
> also be held in contempt or subjected to other appropriate
> sanctions.

Fed. R. Civ. P. 56(h).  Having considered the entirety of the record, I cannot find that Messer's

affidavit was submitted in bad faith or solely for delay, let alone intentionally false as Johns

claims.  Messer based her initial affidavit on the records before her, which did not contain any

informal complaints or grievances from Johns because, to the extent he filed them, they were

deemed to have been submitted in violation of the grievance restriction against him and so were

returned, but not logged.

It may have been helpful and clearer for Messer to note in her first affidavit that informal

complaints and grievances received in violation of a grievance restriction are not logged or

tracked.  That would have helped to put in context her assertion that his records did not reflect

that he had filed any informal complaints or grievances about his claims.  But Messer's

17

contention that, based on the records maintained by the grievance department, Johns did not

properly submit informal complaints or grievances on his claims is an accurate statement, as her

first affidavit said.  (Messer Aff. ¶10–11.)  And there is nothing in the record before me to

suggest that Messer was, in fact, aware of the informal complaints or any other attempts by Johns

to exhaust the claims in this suit when she filed her first affidavit.  Nor do I find anything in the

record to suggest that Messer, defendants, or their counsel intentionally misled the court for any

nefarious purpose.  In short, I do not find sanctions warranted.  For like reasons, I find no basis

for striking her testimony.  Accordingly, both of Johns's motions related to Messer's testimony

will be denied.

IV.  CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment will be denied and

plaintiff's motion will be denied without prejudice.  Also, plaintiff's motion for sanctions and to

strike will be denied.  The case will be referred to the magistrate judge for further proceedings on

exhaustion.  An appropriate order will be entered.

**ENTER**: This 11th day of September, 2020.

_Norman K Moon_
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE